# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-405 (TJK)** |
| **FREEDOM VY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Freedom Vy to 100 days' incarceration, 12 months' supervised release, restitution in the amount of $500, and the mandatory assessment of $25. The government recommends this sentence of incarceration for Vy, a close associate of Zachary Rehl, who knew about the certification taking place on January 6, 2021, joined the hand-selected group of Proud Boys who pledged to follow leadership's commands no matter what and discussed violently storming the Capitol—and then acted in accordance with those plans, breaching the Capitol together with other Proud Boys, struggling against the police, and joining with Rehl to enter the Capitol and pose for victory photographs in a Senator's office.

## I.   Introduction

Defendant Freedom Vy, a 39 year-old self-employed sub-contractor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful

1

transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Vy pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by the fact that Vy came to the Capitol with a group of Proud Boys members from Philadelphia, including Zachary Rehl, who has been convicted of seditious conspiracy and other offenses This group interfered with law enforcement officers' efforts to protect the Capitol and obstructed the Electoral College certification on January 6. ECF No. 64 ¶¶ 13-35. Vy was a member of the "Ministry of Self Defense" (MOSD), a select group of Proud Boys who discussed potential violence on January 6 and storming the Capitol, and agreed to follow their leaders' commands that day.  Vy was well aware of the certification, and actively engaged in preparations to further the group's mission (including by volunteering blood type information in advance of January 6). He traveled to Washington with Rehl, marched to the Capitol with the Proud Boys, and confronted police officers establishing a line on the West Front of the Capitol— the scene of the most violent confrontations between police and the mob. *Id*. at ¶¶ 29-34. After spending over an hour on the West Front, Vy agreed to enter the Capitol Building as a unit with Rehl and other members of his chapter, where they celebrated their achievement by posing with what appears to be a rolled joint in Senator Merkley's hideaway office. *Id*. at ¶¶ 36-40.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Vy's crime support a sentence of 100 days' imprisonment in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECT No. 64.

### Defendant Vy's Role in the January 6, 2021 Attack on the Capitol

Freedom VY was a member of the Philadelphia Proud Boys chapter.    Between at least November 2020 and January 2021, the President of the Philadelphia chapter was Zachary Rehl, and other members of the chapter included Brian Healion and Isaiah Giddings.  The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, the date coinciding with Congress's Certification of the Electoral College vote. A handful of other members of the Proud Boys then created a new chapter that would consist of members from across the country. The new chapter

was referred to as the Ministry of Self Defense or MOSD ("MOSD"). Proud Boys national chairman Enrique Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members."

The following day, Tarrio created a group called MOSD (which stands for "Ministry of Self Defense") on an encrypted messaging application, which group included other leaders and members of the Proud Boys.[2]

By December 30, 2020, VY, using the username "Freedom Reigns," had joined and begun participating in MOSD chats for members.

Tarrio and other MOSD leaders then began to recruit individual Proud Boys for membership in the MOSD. MOSD members were chosen for two crucial traits: the discipline to follow orders from leadership and the penchant to employ street violence against the Proud Boys' perceived adversaries. To achieve the MOSD's goals, certain rules were implemented. First, the group would be made up exclusively of "hand selected" members who were specifically chosen by the MOSD leadership. *United States v. Nordean,* 21-cr-175 (TJK), Trial Ex. 500-69 (Exhibit 1). Second, the group was subject to strict secrecy requirements, with members forbidden from discussing it with outsiders or even with other Proud Boys. *Id.* Ex. 613-P (Exhibit 2). Third, the members were required to observe the chain of command both by following direct orders without question (in one leader's words, "turn your brains off and follow") and by conforming at all times to the general norms and expectations set by leadership ("fit in or fuck off"). *Id.* Ex. 613-E (Exhibit 3) and 503-3 (Exhibit 4). Members were admonished for discussing subjects that did not, in the

---

[2] Between December 30, 2020, and January 6, 2021, there were multiple related Proud Boys chats whose names included "MOSD." The primary MOSD chat for members had more than 50 members.

leaders' view, advance the "mission" of the group. *See id.* Ex. 503-1 (Exhibit 4) and 505-20 (Exhibit 5).

One recurring topic that did *not* draw any such rebuke — and which therefore received tacit approval from the leadership — was the celebration of violence as a means to advance the Proud Boys' political agenda. *See, e.g., id.* at 503- 13 (Exhibit 6) ("Represent, countrywide. Storm everyone's capitals."). In fact, messages exchanged among MOSD members on Telegram discussed plans to come to Washington, D.C., for January 6 and the potential for violence at the Capitol that day. For example, on January 2, one user wrote: "Fuck peace." On January 3, one user noted "1776 flag flying over the White House last night." Another responded, "Gonna be war soon," and "Yes Sir time to stack those bodies in front of Capitol Hill," to which another user responded with the Proud Boys slogan "Uhuru!"[3] A different user posted: "Also this ☝️ . So are the normies and 'other' attendees going to push thru police lines and storm the capitol buildings? A few million vs A few hundred coptifa should be enough. I saw a few normie groups rush through police lines on the 12th."

The next day, members of the MOSD exchanged additional messages on Telegram that discussed attacking the Capitol on January 6, 2021. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, one of the leaders of the MOSD wrote, "They would do nothing because they can do nothing." Another message stated, "It's time to end these crooked thieving fake ass politicians career… They all must leave whether it be The police [or] us citizens dragging them out by their hair."

---

[3] "Uhuru" is a Swahili word meaning "freedom" or "independence."

On January 5, in a new version of the MOSD chat (in which VY also participated), another user sent a message with instructions for the next day: "Everyone needs to meet at the Washington Monument at 10am tomorrow morning! Do not be late! Do not wear colors! Details will be laid out at the pre meeting! Come out []as patriot!"  Another user told the others to "stand by for the shared baofeng [radio] channel and shared zello channel, no colors, be decentralized and use good judgment until further orders."

In addition to VY's participation in the encrypted message groups for members of the MOSD, VY also participated in an encrypted message group for a small group of Philadelphia chapter members. The encrypted message group was created by Philadelphia chapter president Rehl, which included VY, Healion, and Giddings ("Rehl Telegram Group").  This message group contained messages from as early as November 19, 2020.

Rehl, VY, Healion, and Giddings used the Rehl Telegram Group to coordinate their travel to Washington, D.C. for January 6.  Their preparations included sharing their blood types.  Rehl drove VY, Healion, and Giddings to D.C. on January 5.  They arrived in the evening and checked into the Darcy Hotel.

On the morning of January 6, Healion sent a photo of himself and VY in front of the Washington Monument to a Telegram group chat with VY, Rehl, and Giddings. *See* Image 1. Consistent with the directive that had been issued in the encrypted chat for members of the MOSD, VY had gathered with other Proud Boys at the Washington Monument at the appointed time, and VY was not wearing the Proud Boys' traditional black and yellow colors.



Image 1 (VY circled in yellow)

VY met a group of approximately 100 other members at the base of the Washington Monument shortly after 10 a.m. Consistent with the instruction from leadership, none of the men were dressed in traditional black and yellow colors.

At approximately 10:30 a.m., leaders of the group, including Zach Rehl, organized the men into formation and marched the men away from the planned speeches at the Ellipse—and directly toward the Capitol.   VY knew the Vice President was going to be at the Capitol for the certification proceeding that day.

As the group marched toward the Capitol, leaders of the march addressed the men, including VY, through a megaphone—telling them that in their view the police and government had failed them. As the group walked past the west side of the Capitol at approximately 11:20 a.m.—more than an hour prior to the initial breach—one of the leaders of the march announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath

is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means."

A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., members of the group taunted them, yelling "treason," and warning the officers, "don't make us go against you." The group, including VY, continued to march around the perimeter of the Capitol grounds.

The marching group, including VY, arrived at the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, which was approximately 100 feet away, was guarded by a handful of Capitol Police officers.  Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

By the time he arrived at the U.S. Capitol, VY had concealed his face using a red, white, and blue colored bandana, marked to resemble the American flag, although did not consistently use the bandana to cover his face. *See* Images 2 and 3.



Image 2



Image 3

Near the Peace Monument, one of the leaders of the march led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!"   At 12:53 p.m., approximately one minute after Proud Boy Joe Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade.

Rehl and other leaders of the march moved forward and crossed onto Capitol grounds with the crowd. Dozens of others who had marched with VY to the Capitol joined them.

VY also crossed over trampled barriers and advanced toward the Capitol building. VY understood that he was not permitted to be on Capitol grounds.  Once there, Once on Capitol grounds, VY attempted to remain close to Rehl, Healion, Giddings, and another individual (Person-1). The group moved toward the front lines of the rioters, close to the police line. *See* Image 4. From his position near the front of the crowd, VY was in position to see numerous instances where law enforcement were assaulted with physical violence and aerosol sprays. VY also witnessed law enforcement use crowd control measures against the mob, further evidence that the crowd violated lawful commands to disperse.



Image 4 (approximately 1:10 p.m.)

From his position near the front of the crowd in the West Plaza at approximately 1:15 p.m., VY saw law enforcement place bike racks in front of themselves. VY helped a rioter who

had been pepper sprayed in a clash with police cross back from the "police" side of the line to the "rioter" side of the line, interfering with the police enforcement of the riot line. *See* Image 5. He understood that the police were using the bicycle racks to try to establish and hold a police line and keep the rioters away from the Capitol Building.



Image 5 (approximately 1:15 p.m.)

Shortly after 1:15 p.m., law enforcement was able to reform a police line and push members of the crowd away from the Capitol. VY moved backward with the crowd. VY regrouped with Rehl, Healion, Giddings, and Person-1 near the back of the West Plaza. VY stayed on the West Front of the Capitol, near the front lines, for over an hour.

At 2:13 p.m., VY had rejoined Rehl and Giddings on the West Plaza. *See* Image 6



Image 6

Around 2:18 p.m., VY was at the front of the rioters accosting police by calling them traitors. VY joined in, yelling at the officers, "We used to back you guys. . . We saw you make them [women and children] walk around BLM. I know you signed up for a noble job, you meant well when you signed up. . . . But you guys chose your side. . . . Breaks my heart . . ."



Image 7

By approximately 2:10 p.m., rioters had broken through lines of law enforcement and made their way to the Upper West Terrace. Shortly thereafter, rioters began to break windows and open doors, and rioters began to enter the Capitol.  VY, Rehl, Healion, and Person-1 followed rioters up a set of concrete stairs to the Upper West Terrace. Once on the Upper West Terrace, VY and his associates posed for pictures, including the image below, in which where they are making a hand gesture used by the Proud Boys.



*Image 8 (Back Row: Rehl, Jeffery Finley, Giddings, Person-1; Front Row: VY, Healion.*

While standing on the Upper West Terrace, Healion stated that he heard that former Vice President Pence had been "evacuated." VY discussed with Rehl, Healion, and Giddings what was going on in the Capitol, at which point Rehl asked the group whether they wanted to go inside the Capitol.

VY understood that he was not allowed inside the Capitol. VY can be heard on a video stating "I think it's a horrible idea, but I'm not letting you guys go alone," referring to going inside the Capitol.



*Figure 9 (VY with Healion discussing entering the Capitol)*

VY accordingly followed Rehl and entered the Capitol. VY, Rehl, Healion, and Giddings entered the Capitol building at approximately 2:53 p.m. through the Senate Wing Door.  A loud alarm was sounding in the doorway, and broken glass was on the ground.

Once inside, VY, Rehl, Healion, and Giddings entered Senator Jeff Merkley's hideaway office. The men again posed for pictures while making a hand-gesture associated with the Proud Boys.  Below is a picture of (from left to right), Healion, VY, Rehl, and Giddings. *See* Image 10.



Image 10 (From left: Healion, VY, Rehl, Giddings)

After spending approximately twenty minutes inside the Capitol building, VY, Rehl, Healion, and Giddings exited the Capitol building by climbing out through a broken window.

During the attack on the U.S. Capitol, Proud Boys members posted comments to the MOSD chat group describing and encouraging the ongoing assault. One member posted "Storming the capitol [sic] right now!!" a little later, that same member posted to the MOSD group "Got a riot shield!" and "Don't be pushed out we are in the cusp of saving our nation." During the assault, another member posted "As of 10 minutes ago a group of non PB Patriots were gathering up for their second push inside."

Additionally, in the hours immediately following the breach of the U.S. Capitol Building, members of MOSD continued discussions in the encrypted message group. One participant in the message group posted a message that asked whether they needed to go "full 1776" and "continue to escalate and go the 1776 proper route." The evening of January 6, VY gathered with other

members of his chapter, including Rehl, Healion, Giddings, and Person 1.  The group celebrated the Proud Boys' role in the breach of the Capitol.

*The Charges and Plea Agreement*

On November 16, 2024, the United States charged Vy by a four-count Information with violating 18 U.S.C. 1752(a)(1) and (2) and 40 U.S.C. 5104(e)(2)(D) and (G). On June 4, 2024, pursuant to a plea agreement, Vy pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Vy now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 66-75.

The U.S. Probation Office calculated Vy's criminal history score as one, resulting in a criminal history category of I. PSR at ¶ 78. Accordingly, the U.S. Probation Office calculated Vy's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 127. Vy's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 100 days' imprisonment.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at \*5 (D.D.C. Dec. 28, 2021). While assessing Vy's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Vy, the absence of violent or destructive acts is not a mitigating factor. Had Vy engaged in such conduct, he would have faced additional criminal charges.

Vy willingly joined in a collective effort that brought violence to the Capitol on January 6 in an effort to change the course of American history. As shown in Section II(B) of this memorandum, Vy's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Vy's actions took place on the West Front, during a raging battle between rioters and police, and precipitated the collapse of the police line that would lead to further violence still as rioters surged up the Lower West Terrace. The fact that Vy showed his face at the Washington Monument in the morning but concealed it with a gaiter as he breached the restricted perimeter, obstructed police, and broke into the Capitol Building further underscores that he understood exactly what he was doing, and that it was wrong.

Vy's role in the hand-selected cadre of Proud Boys who were MOSD members and planned for January 6 is also aggravating. This group undertook extensive efforts to amass and direct force

and violence against the Capitol. In the private, encrypted chatrooms in which Vy participated with his fellow Proud Boys, the men discussed the use of force, including anticipated violence in connection with the certification proceeding on January 6. *See, e.g.,* ECF 64 at 5 ("time to stack those bodies in front of Capitol Hill"). MOSD membership suggests that Vy was of a certain stature in the group, and was committed to a vision of January 6 that went beyond mere attendance at a presidential rally. The support and willingness of those in MOSD, like Vy, to plan for violence and to follow their leadership's commands, no matter what, had an emboldening effect on the entire cohort. Vy's and others' willingness to be led into violence was one of the things that made the Proud Boys' role on January 6 so dangerous, because they were able to unleash collective violence and chaos. And Vy's participation was not mere talk: he actually acted in accordance with the group's expressed intent and breaking into the Capitol in lockstep with Rehl.

Vy's role as one of the small group of Zachary Rehl's right-hand men that day is further aggravating. That small group made plans together, exchanged blood types, drove to Washington together, marched to the Capitol together, decided to enter the Capitol together, posed for victory photographs together, and celebrated together that night. For his role, Rehl was convicted of seditious conspiracy. V's willing participation by Rehl's side no doubt emboldened and supported Rehl as he helped to lead the collective effort that undermined a fundamental underpinning of American democracy.

Vy's choice to march to and invade Capitol Grounds with other Proud Boys intent on obstruction and violence – and even sedition –made his conduct all the more dangerous and the objective—obstructing the certification—all the more likely to succeed. As the Supreme Court has recognized, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully

attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961); *see also United States v. Rhodes et al.*, 22-cr-15, 5/25/23 Sent. Tr. 111-12 (quoting *Callanan*, 364 U.S. at 593). Vy's tight-knit group of Proud Boy chapter-mates illustrates the point: he and Rehl both took action against the police, and the group made a unified decision to breach the Capitol.

Finally, it is significant that Vy posed for a celebratory photograph inside Senator Merkley's office, together with his chapter-mates, with Vy holding what appears to be a joint. The rioters who invaded the office throughout the day—when it should have been a workspace for a Senator during the certification of the Electoral College vote—prompted Senator Merkley to post a video at 11:36 p.m. that night chronicling the damage to his office.[4] In the video, Senator Merkley explained that rioters appeared to have "smashed the door virtually off its hinges," even though the door was unlocked. He pointed out how the floor was littered with debris. He showed a scroll made for him by a Chinese calligrapher that rioters had torn from the wall. He said that the rioters "left a Trump flag here to mark their presence." Senator Merkley narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes and a cigarette butt on a desk to note that the rioters appeared to have been "smoking something" in the office, before focusing on another discarded cigarette butt or joint on the floor. In Senator Merkley's words, one could "count this office trashed."

---

[4] The three-minute-long video, available on Twitter at
https://twitter.com/SenJeffMerkley/status/1347039504528498688, was rebroadcast by major news outlets.

Entry into a sensitive space, such as a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. While Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office.  A defendant who entered a sensitive space took an extra step to displace Congress and further exerted dominance of the mob over the will of the people. That person's presence was even more disruptive. Invading the office of a member of Congress, and posing for a celebratory photograph there with a cigarette, represents a show of intimidation, an attempted display of power, above and beyond entering the building. In that moment, Vy and his brothers viewed the office of a member of Congress as their dominion and the dominion of all the other members of the mob. And when they did this, Vy, Rehl, Healion, and Giddings had already seen violence—and participated in it themselves. And yet, they celebrated. Their action shows disrespect for the rule of law and American institutions.

In summary, Vy willingly joined a collective effort, through MOSD and through his close association with Rehl, to engage in violence on January 6 and to follow leadership's commands to bring about the group's desired result. He did all this with full knowledge of the certification that day, and with the knowledge that he needed to cover up his face while doing so. The coordination and the context of the offense take Vy support the government's recommended sentence of 100 days' incarceration.

### B.  Vy's History and Characteristics

Vy had multiple contacts with police over a two-year span from 2010 to 2012. PSR ¶ 77-80:

- In 2011, the defendant was convicted of simple assault that occurred in 2010, and was sentenced to two years of probation. PSR ¶ 77
- In 2012, the defendant was arrested and charged with aggravated assault by a vehicle while driving under the influence. *Id.*  ¶78.

Vy's crimes on January 6 were thus not an isolated event in an otherwise law-abiding life. Moreover, the Court should take into consideration defendant's choice to affiliate himself with the Proud Boys, a group that placed a premium on violence – violence to which he contributed at the Capitol. While only one of these actions generated criminal history points under the U.S.S.G., and Vy's criminal record is somewhat dated, they indicate that Vy lacks any particularly mitigating history or characteristics here

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Vy was not only a member of the Proud Boys—a group that placed a premium on violence—he was such a valued member that he was part of the exclusive subset selected to join the "Ministry of Self-Defense" group. This was a group of individuals that Proud Boys leadership knew could be trusted, would follow orders, and could be relied-upon on January 6 to use violence. Indeed, on that day, Vy obeyed leadership's directive not to wear Proud Boys "colors" (black and yellow clothing), marched with leadership from the Washington Monument to the Capitol (lending his presence to their show of force), was near the front of the mob that pushed past the initial barricades at the Peace Circle and carried out the group's objectives of interfering with law enforcement and Congress's certification of the Electoral Vote. Vy's dedication to the Proud Boys, his demonstrated obedience to their directives, and his actions on January 6, undertaken with awareness of the certification, fully support the government's recommended sentence. *See, e.g., Fonticoba*, 21-cr-638 (TJK), Sentc'g Hrg. Tr. at 66-67 *(*recognizing that "intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical in terms of deterrence").

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[5] This Court must sentence Vy based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Vy has pleaded guilty to Count One of the Information, charging him with Disorderly Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. As noted above, while Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office, and thus implicates similar concerns. Another rioter, Brandon Fellows, recognized it as some sort of "Oregon room." Affidavit, *Fellows, supra*, ECF No. 1 at ¶ 15.

In *United States v. Andrew Morgan, Jr.,* 23-cr-313 (TJK), the Morgan, like Vy, joined the riot early—rallying with the front lines of the mob. Morgan, like Vy, also actively berated law enforcement as they were trying to hold the line against rioters. Morgan was present at key locations on the West Front of the Capitol, including the LWT Tunnel and actively encouraged people to resist more as they struggled with police, he joined the mob as it pushed against police at the LWT, and he was present on Capitol Grounds for an extended period of time. This Court sentenced Morgan to 110 days' incarceration and 12 months' supervised release.

In *United States v. Albert Ciarpelli*, 23-cr-398 (CKK), Ciarpelli was just behind the initial rioters who breached the police line north of the Peace Circle. He stepped over the initial perimeter of bike barricades and stepped over more fencing on the west plaza. He put a hand on a bike barricade that other rioters had already lifted overhead to push into police, and then was forced back into the crowd. Ciarpelli ultimately entered the Capitol through the Senate Wing Door at 2:13 pm, moments after the door was initially breached. He exited around 2:30 pm but re-entered through the East Rotunda Door about an hour later. In total, he remained inside the Capitol Buiulding for approximately 35 minutes. The Court sentenced Ciarpelli to 90 days' incarceration and 12 months' supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Vy must pay $500 in restitution, which reflects in part the role Vy played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

by the Architect of the Capitol, USCP, and MPD.) Vy's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 148.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 100 days' incarceration, 12 months' supervised release, restitution in the amount of $500, and the mandatory assessment of $25. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Vy's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      /s/ *Kyle M. McWaters*
Kyle M. McWaters
D.C. Bar No. 241625
Assistant United States Attorney
601 D Street NW
Washington, DC 20850
(202) 252-6983
kyle.mcwaters@usdoj.gov